**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**
Bankruptcy Judge Joseph G. Rosania, Jr.

|  |  |
|---|---|
| In re:<br><br>ROBERT M. KOFFLER,<br><br><br>Debtor. | Case No. 25-14914-JGR<br>Chapter 11 |

## OPINION AND ORDER GRANTING MOTION TO DISMISS CASE

THIS MATTER is before the Court on the Motion to Dismiss Case Pursuant to 11 U.S.C. § 1112(b)(1) (the "Motion to Dismiss") filed by 530 Mashta, LLC and Tri-Cap Holdings, LLC (the "Judgment Creditors") on December 5, 2025 (Doc. 188); the Objection thereto filed by the Debtor on December 19, 2025; the Reply thereto filed by the Judgment Creditors on December 22, 2025 (Doc. 200); and the Joinder to Debtor's Objection filed by Estate of ngena, GmbH on December 22, 2025 (Doc. 203).  For the reasons set forth below, the Court grants the Motion to Dismiss.

## BACKGROUND

Robert M. Koffler ("Debtor"), is a sophisticated businessperson who, in the past, has earned substantial income from his roles as officer, director and equity owner in the tech business sector.  He moved from Miami, Florida, to Snowmass, Colorado in 2020 and since then, has been embroiled in litigation with the Judgment Creditors and others and has left behind a trail of broken promises.  His Chapter 11 case is based on the continued pursuit of litigation in various forums.

### 1.  Debtor's Bankruptcy Case

The Debtor commenced this Chapter 11 case on August 5, 2025 (Doc. 1).  The Debtor has filed monthly operating reports of his income and expenses, which, as demonstrated below, reflect limited income.  On December 3, 2025, the Debtor filed a Chapter 11 plan and disclosure statement (Docs. 181, 182; Exs. 13, 14).  The Debtor later amended the plan and disclosure statement on March 10, 2026 (Docs. 236 and 237) to address issues raised by the Judgment Creditors at the evidentiary hearing.

The Debtor's proposed plan relies on three categories of funding: (i) income from the Debtor's consulting arrangement with Black Dove, Inc. ("Black Dove"), (ii) monetization of a judgment or settlement in the BAA / BA Tech Litigation pending in the Circuit Court of the Eleventh Circuit in and for Miami-Dade County, Florida, and (iii) monetization of approximately $6 million equity in the BSL Property from continued litigation, including potential appeals, and ultimately selling the BSL Property.

The Court conducted a preliminary hearing on the Motion to Dismiss on December 19, 2025 (Doc. 204), pursuant to 11 U.S.C. § 1112(b)(3), at which it considered offers of proof and exhibits from the parties.  After hearing the offers of proof, it set a final evidentiary hearing due to the compelling circumstances of the complexity of the case, the need to analyze multiple pending civil actions, and receive testimony and consider exhibits.  The evidentiary hearing was conducted in-person on January 21, 2026.

After the evidentiary hearing the Debtor filed: (i) a Supplement on January 29, 2026 (Doc. 227), containing his January 26, 2026, objection to the Verdict, (ii) an amended plan and amended disclosure statement on March 10, 2026 (Docs. 236 and 237), and (iii) a status report on March 10, 2026, stating that the amended plan and amended disclosure statement were filed in response to issues raised by the Judgment Creditors at the hearing on the Motion to Dismiss (Doc. 238).

## 2.  Debtor's Assets and Liabilities

The Debtor's initial Schedules listed no real property, two older motor vehicles, furniture, jewelry, clothing, and litigation claims, totaling $62,913.73.

The Schedules were amended on September 17, 2025, to add a 100% interest in 115 Blue Spruce Lane, LLC with an estimated value of $6,000,000 and equity interests in: Maite; BA Tech Partners GP, LLC; BA Tech Partners, LP; Insurance Resources, LLC; and RMK ngena, LLC.  The values of Maite and BA Tech Partners GP, LLC were listed as "unknown" and the values of BA Tech Partners, LP, Insurance Resources, LLC and RMK ngena, LLC were listed at $0.00.

The Debtor amended his Schedules a second time on January 20, 2026, on the eve of trial, to add a Venmo account with an "unknown" value.

The Debtor's initial Schedules reflected $48,344.40 in income tax debt, and approximately $25.9 million in unsecured debt.  The largest scheduled claims arise from the Florida litigation, including claims of approximately $9.6 million held by 530 Mashta, LLC and approximately $7.5 million held by Tri-Cap Holdings, LLC (Claims Register, Claims 7 and 8; Doc. 213).

2

The litigation claims the Debtor identified in the initial Schedules as personal property were against: (i) Lera Investment Technologies, Inc., (ii) 115 Blue Spruce Lane, LLC, 530 Mashta, LLC and Dinamo Driftwood, LLC pending in the Pitkin County District Court, (iii) Carlos Espinosa and (iv) shareholder claims against Lera Technologies, Inc., all of which were valued as "unknown."

The September 17, 2025, amended Schedules added a litigation claim owned by Biscayne America Advisors, LLC, a company wholly owned by Maite which is wholly owned by the Debtor against BA Tech Partners GP, LLC and ngena Investment, SPV, LP, pending in Florida state court valued as "unknown."

The Debtor's Statement of Financial Affairs was also amended twice on September 17, 2025, and January 20, 2026. The January 20, 2026 amendment was made to identify the proceeds of certain sales of art made within two years prior to the bankruptcy filing.

The Estate of ngena GmbH filed a proof of claim the amount of $119,075,620 on November 13, 2025 (Claims Register, Claim 6). That claim, which was not scheduled by the Debtor, has not been reduced to judgment and is contingent and unliquidated.

### 3. Related Bankruptcy Case Filed by Maite, LLC

On September 17, 2025, Maite filed its own Chapter 11 case (25-15985-JGR, Doc. 01). On September 23, 2025, Judgment Creditors filed an Expedited Motion to Dismiss or Convert Case of Maite, LLC (Doc. 95).

This Court dismissed Maite's Chapter 11 case as a bad faith filing on October 27, 2025 (Case No. 25-15985-JGR, Docs. 24, 25), concluding the case was a two-party dispute and a single asset case with no business, no employees or legitimate reorganization purpose The dismissal order is final and non-appealable.

### 4. Florida Litigation and Judgments

In July 2024, Judgment Creditors and Reinsurance Partners Investments, LLC commenced litigation against the Debtor and Maite, LLC ("Maite"), in the United States District Court for the Southern District of Florida for breach of contract.

A five-day bench trial was held in the United States District Court for the Southern District of Florida, at which the Debtor testified for two days. Chief United States District Judge Cecilia M. Altonaga found the Debtor's testimony and claims were not credible (Ex. $). On June 27, 2025, judgments were entered against the Debtor and Maite in favor of 530 Mashta, LLC in the amount of $9,653,288.10 and in favor of Tri-Cap Holdings, LLC in the amount of $7,570,583.10. The judgments were not appealed and are final. Chief

3

After the appeal period expired, the Judgment Creditors initiated collection efforts, including pursuing writs of garnishment, filing a judgment lien, obtaining a charging order against Maite and the Debtor's interest in BA Tech Partners, GP, LLC (which is owned by Maite), and attempting to execute on equity interests owned by the Debtor and Maite, including the equity interest in Lera Investment Technologies, Inc.

Those enforcement actions were ongoing at the time the Debtor filed this Chapter 11 case.  The filing of the petition stayed further collection activity.

### 5.  Blue Spruce Lane Property and Pitkin County Litigation

The Debtor resides in a luxury home in Snowmass, Colorado located at 115 Blue Spruce Lane (the "BSL Property").  Snowmass is nestled in the Colorado Rockies and is known worldwide for its stunning alpine scenery, skiing, snowboarding, hiking, biking and year-round cultural events.  The Debtor moved from Florida to Colorado and has resided in the BSL Property with his family since 2020.  Title to the property is held by 115 Blue Spruce Lane, LLC.  The Debtor claims an interest in 115 Blue Spruce Lane, LLC and, through it, an interest in the BSL Property.  115 Blue Spruce Lane, LLC, 530 Mashta, LLC and Dinamo Driftwood, LLC ("Dinamo"), dispute that the Debtor owns any interest in 115 Blue Spruce Lane, LLC and/or the BSL Property.

Litigation concerning ownership and control of 115 Blue Spruce Lane, LLC and the BSL Property has been pending in the Pitkin County District Court (the "Pitkin County Litigation") since July 29, 2024, when 115 Blue Spruce Lane, LLC, Dinamo and 530 Mashta, LLC initiated an action to evict the Debtor from the BSL Property.  They sued because the Debtor had been living in the BSL Property since 2024, without paying the mortgage or related expenses for the BSL Property, totaling over $32,000 per month.

The Pitkin County Litigation involves competing claims to the ownership of membership interests in 115 Blue Spruce Lane, LLC and the validity of certain pre-petition transfers and encumbrances affecting those interests.  Early in this bankruptcy case, the above-referenced creditors moved for relief from the automatic stay to continue the Pitkin County Litigation, including the claim to evict the Debtor from the BSL Property (Doc. 17).  The Debtor objected, arguing the matter should be adjudicated in this Court because he wanted a centralized forum to resolve claims and only this Court had jurisdiction over a new counterclaim he was going to assert for recovery of his transfer of his interest in 115 Blue Spruce Lane, LLC to Dinamo, as a fraudulent transfer under 11 U.S.C. § 548 (Doc. 54).

On September 3, 2025, this Court granted relief from the automatic stay, as to all parties, to permit the Pitkin County Litigation to proceed.  This decision was based on the facts that the litigation had been pending in state court for over one year, a Special Master

had been appointed by the Pitkin County District Court to preside over the case who was familiar with the action, the litigation involved questions of Colorado state property and eviction law, and the Debtor could pursue a fraudulent transfer counterclaim under state law in that forum (Docs. 59, 60).

On January 12, 2026, the Special Master issued the Verdict, Order, and Recommendation addressing the parties' competing claims (Exhibit 5; the "Verdict").  The matter was tried on December 1 and December 2, 2025 and the Debtor testified at the trial.  The Special Master set forth the history of the transactions between the Debtor and the Dinamo parties regarding the BSL Property in detail at pages 1 through 8 of the Verdict.

The Special Master determined that ownership of the membership interests in 115 Blue Spruce Lane, LLC resides with Dinamo, rejected the Debtor's claims for constructive trust and fraudulent transfer, and concluded that the governing agreements created an equitable mortgage requiring enforcement through judicial foreclosure.  The Debtor filed a seventeen-page objection to the Verdict with the Pitkin County District Court on January 26, 2026, and the matter remains pending.

Each side has its own interpretation of the Order.  The Dinamo parties point to pages 7, 8 and 16 of the Order.  On page 7, the Special Master found that the Debtor breached his promises to pay his debts and leave the BSL Property as he had promised and that the Debtor offered no credible explanation why he is remaining in the BSL Property without paying rent.  The Special Master found the Debtor to be a sophisticated businessperson who understood his obligations.

On Page 8, the Special Master concluded that under contract law, Dinamo is the owner of 115 Blue Spruce Lane, LLC, that it is entitled to record a deed of the BSL Property from 115 Blue Spruce Lane, LLC to itself, that the Debtor expressly waived any equity in the BSL Property, and that the Debtor should vacate the BSL Property.

Finally, on page 16, the Dinamo parties contend that the Special Master rejected the Debtor's claims of constructive trust and fraudulent transfer and did not void any of the underlying transaction documents.

The Debtor, however, claims that the Special Master left the issue of whether the Debtor waived equity in the BSL Property unresolved and that the Special Master did not adequately address all of the fraudulent transfer claims.

### 6. BiscayneAmericas Advisors / BA Tech Litigation

The Debtor proposes to fund his plan of reorganization, in part, by successfully pursuing certain litigation on behalf of BiscayneAmericas Advisors, LLC ("BAA") against BA Tech Partners GP, LLC ("BA Tech") (jointly "the BAA / BA Tech Litigation") (Doc. 213). The BAA / BA Tech Litigation is a partnership dispute. The Debtor's interest in BAA is held through Maite, an entity owned and controlled by the Debtor.

A default judgment was previously entered against BA Tech, which was later vacated, and the action is proceeding on the merits, scheduled for trial in 2027

The Debtor presented no credible evidence to this Court at the January 21, 2026 evidentiary hearing of the nature of the claims, such as a copy of the complaint, summary of the claims or the testimony of his lawyer pursuing the claims, the probability of success on the merits or whether any judgment obtained would be collectible. His testimony was a confusing morass of facts in which he never identified the precise nature of the claims or the exact identity of the party at fault. Moreover, the Debtor is represented in that matter pursuant to a contingency fee agreement, which entitles counsel to a 40 percent contingency fee of any recovery. In addition, a charging order in favor of the Judgment Creditors directs that distributions otherwise payable to the Debtor or Maite as a result of any judgment or settlement be applied to satisfy the judgment of the Judgment Creditors. As a result, any recovery in the BAA / BA Tech Litigation is contingent on the success of the claims, payment of a substantial contingency fee, uncertainty of collection, and satisfaction of the judicial lien of the Judgment Creditors on any net proceeds before any benefit would be realized by the bankruptcy estate.

### FINDINGS OF FACT

### 1. Evidentiary Hearing and Exhibits

The following witnesses testified at the evidentiary hearing: Delia Lozano Luna, Robert M. Koffler, and Marc Billings (Doc. 224; Doc. 228, pp. 29, 51, 105, 134).

At the commencement of the hearing, the parties stipulated to the admission of all exhibits identified on their respective exhibit lists (Doc. 224).

The Judgment Creditors' admitted exhibits consist of Exhibits 1 through 29, including: (Ex. 1) the Order Vacating Default Final Judgment in the BAA / BA Tech Litigation; (Ex. 2) the Charging Order Against Maite's Membership Interest in BAA; (Ex. 3) the AXS Law contingency fee agreement relating to the BAA / BA Tech litigation; (Ex. 4) the June 12, 2025 Florida federal district court bench ruling; (Ex. 5) the Special Master's Verdict, Order and Recommendation dated January 12, 2026; (Ex. 6) the Black Dove

Consulting Agreement dated August 19, 2025; (Ex. 7) excerpts from the Debtor's Rule 2004 examination transcript; (Exs. 8–12) bank records and communications concerning transfers, alleged loans, and undisclosed art-sale proceeds; (Exs. 13–14) the Debtor's Chapter 11 plan and disclosure statement; (Exs. 15–19) the Debtor's petition, payment advices, Schedules, and amended Schedules and statement of monthly current income; (Exs. 20, 22-23, 25) the Debtor's monthly operating reports; (Ex. 21) the Order Granting Application to Employ Rennert Vogel Mandler & Rodriguez, P.A. (Exs. 24, 26, 27) proofs of claim; (Ex. 28) the Debtor's Chapter 11 status report; and (Ex. 29) the order setting the BAA / BA Tech litigation for trial in January 2027 (Doc. 224).

The Debtor's admitted exhibits consist of Exhibits A through K, including: (Exs. A–B, J) the Debtor's original and amended Schedules and Statements of Financial Affairs; (Exs. C–D) the Debtor's Chapter 11 plan and disclosure statement; (Ex. E) the claims register; (Ex. F) the November 2025 monthly operating report; (Ex. G) the Pitkin County Special Master's Verdict, Order, and Recommendation; (Ex. H) the amended complaint in the Pitkin County litigation; (Ex. I) Defendant's proposed findings of fact in the Pitkin County litigation; (Ex. J) Amended Statement of Financial Affairs and Amended Schedules A and B (Doc. 221); and (Ex. K) the notice of amendment to Schedules and Statements (Doc. 222).

The Court has considered all of the pleadings filed in the bankruptcy case, the testimony of the witnesses, the Stipulated Facts provided in the Pretrial Statement (Doc. 213), and the admitted exhibits.

### a. Testimony of Delia Lozano Luna

Delia Lozano Luna ("Luna") testified on behalf of the Judgment Creditors, 115 Blue Spruce Lane, LLC, and Dinamo. She is a lawyer in Mexico City and the corporate representative of the foregoing entities.

She testified regarding the breach of contract Florida litigation and the resulting judgments entered against the Debtor. She was a witness at the trial. She identified the judgment entered on June 27, 2025 in favor of 530 Mashta, LLC and Tri-Cap Holdings, LLC and described the amounts awarded under that judgment (Ex. 4). She stated the Judgment Creditors had made multiple loans to the Debtor over many years and offered him several extensions to pay them back. She testified that the Debtor defended the Florida lawsuit by contending he did not remember signing the loan documents, he did not understand the loan documents, and he did not have the chance to engage counsel to review them. She stated that Chief United States District Judge Cecilia M. Altonaga found that his testimony and defenses lacked credibility in her bench ruling (Ex. 4).

7

Luna further testified that, following entry of judgment, the Judgment Creditors commenced collection efforts against the Debtor and his various entities. Those efforts included pursuing garnishment remedies, seeking charging orders against interests held through Maite and attempting to reach equity interests owned by the Debtor, including interests in Lera Investment Technologies, Inc. She testified that those collection efforts were ongoing at the time the Debtor filed this Chapter 11 case.

Luna also testified regarding the BSL Property. She stated that the Debtor asked Dinamo for a loan to help him buy the property. The terms were that he would either satisfy the first mortgage and the Dinamo loan in two years or move out from the BSL Property. However, at the end of the two-year period, he did not pay the first mortgage, or the Dinamo loan or vacate the premises. When Dinamo filed an eviction action, she testified the Debtor came up with defenses similar to those he asserted in the Florida federal civil action that he did not understand the documents he signed and did not have a chance to engage counsel to review them.

She testified the Debtor has not paid the $32,000 per month mortgage payment since June of 2024 and that Dinamo has been forced to pay the mortgage, taxes, insurance and roof repair to protect its interest since it is jointly liable on the first mortgage. In total, she testified Dinamo is owed over $5 million in connection with the BSL Property, consisting of the loan it made to assist the Debtor in his purchase of the BSL Property and the monthly mortgage, tax, insurance payments, and maintenance, including a new roof. She also testified that the Debtor has refused to move out so Dinamo can rent the house, which she believes would yield $85,000 per month in market rent. In summary, the longer the Debtor stays in the house without paying the mortgage and related expenses, the higher the debt to Dinamo becomes.

She also testified regarding her knowledge of the BA / BAA Tech Litigation, summarizing that, to her knowledge, the Debtor is suing entities in which he is a member for investments that he made and that the defendants in the action have no assets. The Debtor never disputed this characterization.

Finally, she also testified about the Debtor's most recent litigation maneuver. She testified that the lawyer the Debtor retained on behalf of the bankruptcy estate to file a Rule 60 motion seeking relief from the Florida Judgment, Robert Stein of the law firm of Rennert Vogel Mandler & Rodriguez, P.A., filed and served a lawsuit on behalf of one of the ngena entities against the Judgment Creditors on the Sunday evening before the Wednesday evidentiary hearing, demanding that the Judgment Creditors drop their Motion to Dismiss and waive their rights to the BSL Property.

The Court finds it significant that there was no cross examination. Luna was a credible witness whose frustration with the Debtor was visible since he owes the entities

she represents over $22 million, has squatted in the BSL Property since 2024, and never paid a penny on any of these debts.

### b. Testimony of Debtor Robert Koffler

The Debtor testified regarding his financial condition, sources of income, assets, liabilities, litigation matters, and the basis for his proposed Chapter 11 plan.

The Debtor testified that he is a 65-year-old individual. He is not currently operating a business and does not have employees or trade creditors. He testified that he had been unemployed for approximately one year prior to the filing of the bankruptcy case and that he did not receive income during that period. He said he was in a difficult situation trying to reorganize his life and find a path forward.

With respect to current income, the Debtor testified that he recently entered into a consulting agreement with Black Dove (Ex. 6). He identified the compensation under that arrangement as $7,500 per month, payable quarterly, or $22,500 per quarter, with payments made in arrears. He testified that he had not received the full amount due under the agreement since he had only received two payments, one for $7,500 and one for $1,000. He stated that he permitted Black Dove to retain funds rather than pay him in full. He further testified that he expected his compensation to increase based on discussions regarding an expanded role but acknowledged that those expectations were based on an unwritten oral understanding with no fixed terms, no definite timeline, and no executed agreement reflecting increased compensation. The Debtor testified that he anticipated improvement in his financial condition through increased income and potential equity participation in Black Dove.

He also testified he expected to receive financial support from his wife. However, he testified that his wife has no current income, has never worked outside the home, and he did not provide an affidavit or testimony from her regarding her willingness or ability to contribute to his plan or pay household living expenses. Although the Debtor stated that he expected his wife, family members, and other individuals would assist with his living expenses, he was unable to identify any written agreements, financial commitments, or produce sworn testimony from those individuals is support of such expectations.

The Debtor testified that he began receiving Social Security benefits shortly before the hearing, including an initial payment of approximately $7,000 covering two months and expected ongoing payments of approximately $3,200 per month.

With respect to his bankruptcy disclosures, the Debtor testified that certain transactions were not included in his original or amended Statement of Financial Affairs. He acknowledged that income from pre-petition sales of art in the amount of $112,478

9

was omitted from his original and amended Statement of Financial Affairs, but stated he amended his Statement of Financial Affairs a second time the day before the hearing after counsel for the Judgment Creditors identified the omissions through a review of his bank statements.  He testified that the omissions were not intentional, attributing them to the volume of information he was required to compile for the bankruptcy case.

The Debtor also testified regarding redactions in the contingency fee agreement with AXS Law Group PLLC for the BAA / BA Tech litigation (Ex. 3).  He stated that he did not recall what information had been redacted or which attorney had directed the redaction.  He further testified that he did not recall whether he had agreed to provide any additional portion of litigation recoveries to AXS.

The Debtor testified that his proposed plan relies in part on recoveries from the BAA / BA Tech litigation.  He testified that BAA is owned by Maite, an entity he owns and controls.  He further testified that a charging order has been entered against his economic interest in Maite, LLC in favor of the Judgment Creditors.   He acknowledged that distributions attributable to Maite's interest in BAA would be payable to the Judgment Creditors rather than to him personally to fund his plan.

The Debtor testified that although his initial plan projected approximately $8 million in net recoveries from the BAA / BA Tech litigation claim, he amended his plan to adjust the net recovery down to $4-5 million due to the 40 % contingency fee agreement.

The Debtor also testified regarding a claim asserted by the Estate of ngena in the amount of $119,075,620.  He acknowledged that this claim was not included in any of his bankruptcy Schedules.  He testified that he traveled to Frankfurt, Germany, in the fall of 2025, where he met with the German liquidator for ngena, and discussed both his bankruptcy case and matters relating to ngena and the Estate of ngena filed its proof of claim after that meeting.  He further testified that he had communicated with the German liquidator for ngena before and after the meeting, including communications as recent as the day before his testimony in this Court.

Next, the Debtor testified regarding the BSL Property.  He testified that his plan projected approximately $5 million in net proceeds from the sale of the BSL Property based upon a $14 million sale figure, which he testified was net of brokerage commissions, taxes, and closing costs.  He testified that the BSL Property is subject to a first mortgage in the approximate range of $5.8 million to $5.9 million.  He also testified that there are additional encumbrances of approximately $3 million, disputing Luna's testimony that Dinamo was owed $6 million on the BSL Property.  If Luna is correct, even if the Debtor is successful in claiming entitlement to the equity in the BSL Property, the amount that would be available to creditors would be $2 million and not $5 million.

The Debtor agreed that he has not paid the mortgage on the BSL Property since June 2024, and that he missed monthly payments prior to June 2024. He did not directly answer a question from the Judgment Creditors that he missed twelve mortgage payments prior to June 2024. He blamed his failure to pay the mortgage on the Dinamo parties since he stated they ran to the bank and began paying the first mortgage after he defaulted. He testified that the judicial foreclosure phase of the Pitkin County Litigation would address additional issues and that the outcome of the Pitkin County Litigation would determine his ability to include the equity from the BSL Property in his plan to pay his creditors.

The Debtor also testified regarding a potential income tax liability associated with a prior debt-forgiveness transaction in which he received forgiveness of debt in the approximate amount of $6.2 million. He testified that the potential tax exposure from the forgiveness of debt transaction ranges from approximately zero to $2 million and acknowledged that this potential liability was not included in his financial projections. In fact, he listed priority income tax claims in the amount of $50,000 in his amended plan.

The Debtor had no credible explanation for failing to include the income from the sales of the art in his Statement of Financial Affairs. His testimony did not support the feasibility of his proposed plan. The anticipated income, including increased compensation and equity participation in Black Dove, is speculative, and financial support from family members and friends was not supported by written agreements or evidence.

Overall, the Debtor was a combative and evasive witness in response to the Judgment Creditors examinations.

### c. *Testimony of Marc Billings*

Marc Billings testified as a fact witness regarding Black Dove, his relationship with the Debtor, the Debtor's compensation, and Black Dove's financing and operations. He testified about his background which included an undergraduate degree from the University of Pennsylvania, a CPA license, and work in the accounting field and private equity real estate.

Mr. Billings testified that he is the founder and chief executive officer of Black Dove, a company he formed in approximately 2015. He described Black Dove as a media streaming platform for digital art, which has developed a software infrastructure designed to distribute digital art across various devices and platforms.

Mr. Billings testified that he met the Debtor socially over ten years ago. He stated that he had followed the Debtor's involvement with prior ventures, including ngena and Lera Investment Technologies. He testified that, in the summer of 2025, Black Dove was

11

experiencing a period of reduced activity, and he sought the Debtor's input regarding how to reposition the company in the market and approach potential capital raises. According to Mr. Billings, these discussions led to the Debtor providing consulting and strategic advice beginning in the summer of 2025.

Mr. Billings testified that the Debtor assisted Black Dove in developing a revised approach to its market positioning and capital-raising efforts. He testified that, in his view, the Debtor's work contributed to Black Dove entering into a signed agreement for a new $10 million investment in November 2025 from two private families

With respect to compensation, Mr. Billings testified that the Debtor's current compensation is governed by a written consulting agreement (Ex. 6). He testified that it provides for payments of $22,500 per quarter, which corresponds to approximately $7,500 per month, and that the payments are made in arrears. He testified that the agreement does not include provisions for bonuses, increases in compensation, or long-term employment terms. He admitted that the agreement is terminable on 30 days' notice.

Mr. Billings admitted that Black Dove had not paid the Debtor the full amount due under that agreement. He testified that consulting fees for multiple months, including November, December, and January, remained unpaid at the time of his testimony.

Mr. Billings testified that discussions had taken place regarding expanding the Debtor's role within Black Dove. He testified that the future role under discussion was for the Debtor to assume a chief operating officer position and that the compensation associated with that role would be approximately $150,000 annually, with performance-based compensation that could increase total compensation to a range of approximately $400,000 to $500,000. He also testified that the company's internal budget contemplated increasing the Debtor's compensation to approximately $12,500 per month. He acknowledged that no new written agreement reflecting these terms had been prepared or executed.

Mr. Billings testified regarding Black Dove's operating condition and financial history. He stated that the company has existed for approximately ten years and that revenue has fluctuated over time. He testified that the company's highest revenue was approximately $2 million, which occurred five or six years prior to the hearing. He further testified that projected revenue for 2025 was approximately $600,000. He testified that the company had historically operated primarily through independent contractors and did not maintain a physical office.

Mr. Billings testified that Black Dove's financial history included reliance on outside investment as well as personal investment. He stated Black Dove had received financing over 10 years from seventy-two different investors.

12

With respect to financing, Mr. Billings testified that Black Dove had entered into an agreement for a $10 million investment from two private families in November 2025.  He testified that the investment was structured in four tranches of $2.5 million each and that the first tranche was expected to fund in the near-term.

On cross-examination, Mr. Billings testified that only $250,000 of the anticipated funding had been received, which was funded upon execution of the agreement in November 2025.  He testified that none of the additional tranches of the $10 million investment had been funded.

He further testified that, in January 2026, an additional $500,000 investment was agreed to with another investor, and that, of that amount, approximately $250,000 had been invested at the time of his testimony.

Mr. Billings admitted that, aside from the consulting agreement with the Debtor, he had not produced any documents regarding financing in response to a subpoena from the Judgment Creditors in advance of his December 2025 deposition.  This is troubling to the Court and calls into question the veracity of his testimony.  If Mr. Billings was worried about trade secrets by revealing the sources or terms of the financing, he should have generally identified the financing and claimed the documents were privileged as a trade secret.

In discounting Mr. Billings' testimony, the Court notes several concerns.  Mr. Billings is friends with the Debtor.  He did not employ the Debtor until after the filing of the Chapter 11 case.  He admitted Black Dove was in default of its payment obligations under the consulting agreement and that he was unsure of the certainty and timing of future funding and the Debtor's prospective compensation.  Finally, he failed to comply with a subpoena, without explanation.

## 2.  Findings

The Debtor is an individual who does not operate an ongoing business (Doc. 213; Doc. 228).  He does not have employees, an operating business, or a revenue-generating enterprise (Doc. 213).

The Judgment Creditors hold a final judgment against the Debtor in excess of $17 million (Doc. 188; Exs. 26, 27). Although the Debtor claimed crucial evidence was not presented at the trial and he retained counsel to file a Rule 60 motion seeking relief from the judgment, no motion has been filed.  He claimed, erroneously, that he has two years to file a Rule 60 motion. 530 Mashta, LLC filed a proof of claim in the amount of $9,653,288.10 based on a federal court final judgment (Claims Register, Claim 7; Ex. 27). Tri-Cap Holdings, LLC filed a proof of claim in the amount of $7,570,583.39 based on the

13

same federal court final judgment (Claims Register, Claim 8; Ex. 26).  The Court finds that this judgment constitutes the majority of the liquidated debt in this case (Doc. 213; Ex. E).

The Debtor filed this Chapter 11 case following entry of that judgment and during active collection efforts.  The Court finds that, at the time of filing, the Debtor was facing enforcement of the judgment and was engaged in litigation concerning his asserted interest in the BSL Property (Doc. 213).  The Debtor hoped he could remove that litigation to the bankruptcy court and assert fraudulent transfer claims, which would delay the matter.

In a status report filed in this case, the Debtor admitted that the bankruptcy filing was undertaken to stop collection efforts, provide time to assess litigation claims, and pursue a plan that would provide a distribution to creditors (Doc. 105).

The following is a summary of the claims register in this case:

Secured Claims:

| Claim No. | Claimant | Basis | Amount |
|---|---|---|---|
| 4-1 | JPMorgan Chase Bank, N.A. | Auto loan, secured against 2022 Subaru Forester | $20,449.21 |
| 7-1 | 530 Mashta, LLC | Judgment Lien | $9,653,288.10 |
| 8-1 | Tri-Cap Holdings, LLC | Judgment Lien | $7,570,583.39 |

Priority Claims:

| Claim No. | Claimant | Basis | Amount |
|---|---|---|---|
| 1-3 | Colorado Department of Revenue | 2022, 2023, 2024 Taxes | $23,207.00 |
| 1-2 | IRS | 2024 Taxes | $0.00 |

Unsecured Claims:

| Claim No. | Claimant | Basis | Amount |
|---|---|---|---|
| 3-1 | JP Morgan Chase | Credit Card | $25,341.58 |
| 5-1 | Wells Fargo Bank, N.A. | Money Loaned | $8,081.26 |
| 6-1 | Estate of ngena, GmbH | Claims asserted by the insolvency administrator for ngena, for breach of contract, | $119,075,620.00 |

14

| Claim No. | Claimant | Basis | Amount |
|---|---|---|---|
| | | negligent misrepresentation, and breach of fiduciary duty | |
| 9-1 | Dinamo Holdings Trust | Money Loaned | $409,851.83 |
| 10-1 | 530 Mashta, LLC | Money Loaned | $461,802.04 |
| 11-1 | Rainmaker Group International | Money Loaned | $15,473.58 |
| 12-1 | Crisoforo Lozano Luna | Money Loaned | $145,690.00 |
| 13-1 | Financial Mechanics, LLC | Money Loaned | $30,000.00 |
| 14-1 | Thor Equity Trust | Money Loaned | $377,851.83 |
| 15-1 | Eureka Re | Promissory Note | $1,966,934.56 |
| 16-1 | Dinamo Driftwood LLC | "Contingent" | *Unknown* |
| 17-1 | Gabriel Holschneider | Money Loaned | $119,355.92 |
| 18-1 | XS-Latam Thor, LLC | Money Loaned | $30,500.00 |

The Judgment Creditors established that the creditors who have filed claims are either friends of the Debtor or for litigation expenses.  They doubted the claim for ngena was legitimate since it was never included in any of the Debtor's Schedules and was only filed after the Debtor traveled to Germany and met with ngena.  The proof of claim and its attachments are confusing and are based on claims asserted against the Debtor for breach of contract, negligent misrepresentations, and breach of fiduciary duty in the Debtor's capacity as "controlling person" of the ngena GmbH Shareholder Group.

The Debtor filed his initial Chapter 11 plan (Doc. 281) and disclosure statement (Doc. 282) on December 3, 2025, the last day of the exclusivity period.  The plan identified three primary sources of funding: (i) the Debtor's income, (ii) potential recoveries involving the BAA / BA Tech Litigation, and (iii) proceeds from the sale of the BSL Property.  The amended plan filed on March 10, 2026 (Doc. 236), makes corrections to the initial plan, reducing the amount of the net recovery from the BAA / BA Tech Litigation and revises the financial projections to include living expenses.  It was difficult for the Court to determine the content of the revisions because the Debtor failed to file a red-line version highlighting the changes.  The Court finds that, under both plans, the Debtor's plan to pay creditors is predominantly litigation-contingent rather than income-driven.  The Court further finds that each of the three primary sources of funding proposed by the Debtor's plan is uncertain and contingent on future events, including the Debtor's ability to secure increased compensation, the success of Black Dove, the successful prosecution and collection of litigation claims, and the outcome of ongoing litigation concerning ownership and control of the BSL Property.

The Debtor's monthly operating reports reflect that expenses have exceeded receipts during the bankruptcy case.

August 2025 (Doc. 94)

| Beg. Cash | Receipts | Disbursements | End Cash |
|-----------|----------|---------------|----------|
| $8,406 | $3,125 | $9,657 | $1,874 |

September 2025 (Doc. 145)

| Beg. Cash | Receipts | Disbursements | End Cash |
|-----------|----------|---------------|----------|
| $1,874 | $5,960 | $6,575 | $1,258 |

October 2025 (Doc. 178)

| Beg. Cash | Receipts | Disbursements | End Cash |
|-----------|----------|---------------|----------|
| $497 | $3,194 | $3,102 | $589 |

November 2025 (Doc. 199)

| Beg. Cash | Receipts | Disbursements | End Cash |
|-----------|----------|---------------|----------|
| $589 | $8,238 | $3,857 | $4,970 |

December 2025 (Doc. 226)

| Beg. Cash | Receipts | Disbursements | End Cash |
|-----------|----------|---------------|----------|
| $4,970 | $8,658 | $10,725 | $2,902 |

January 2026 (Doc. 234)

| Beg. Cash | Receipts | Disbursements | End Cash |
|-----------|----------|---------------|----------|
| $2,902 | $9,013 | $9,803 | $2,112 |

February 2026 (Doc. 243)

| Beg. Cash | Receipts | Disbursements | End Cash |
|-----------|----------|---------------|----------|
| $2,112 | $8,990 | $10,707 | $395 |

March 2026 (Doc. 256)

| Beg. Cash | Receipts | Disbursements | End Cash |
|-----------|----------|---------------|----------|
| $395 | $5,706 | $5,723 | $378 |

These monthly operating reports indicate that the Debtor's has generated minimal income in the post-petition period from the consulting agreement with Black Dove and Social Security income (Exs. 20, 22, 25, 23; Doc. 226; Doc. 234; Doc 243; Doc. 256).

16

The Court further finds from the evidence that the Debtor has not demonstrated the existence of a stable, substantial, or growing income stream sufficient to fund a Chapter 11 plan addressing the very large claims filed in this case.  The Debtor estimates a minimal 3% distribution to unsecured creditors over time in his amended plan.

On September 3, 2025, at the preliminary hearing on the motion for relief from stay to continue the Pitkin County Litigation, the Debtor stated that his wife either had received or was going to receive a large inheritance which would enable her to begin making the $32,000 monthly mortgage payment on the BSL Property.  She has not made any post-petition mortgage payments.  He testified at the evidentiary hearing that his spouse or her family would provide sufficient financial support to cover living expenses (Doc. 228, p. 51), but he did not present testimony from his spouse (Doc. 224, p. 1).  Based on the evidence presented, the Court finds that the Debtor's spouse has no current income, has not worked outside the home, and did not provide testimony, an affidavit, or documentation establishing a willingness or ability to provide financial assistance.

The Court finds that, to date, the Debtor has not established a present right to control, sell, or otherwise realize value from the BSL Property (Ex. 5 / Ex. G; Doc. 227-1).

The Court finds that the Debtor testified to a potential tax liability arising from a debt forgiveness transaction in which debt in the approximate amount of $6.2 million was forgiven, with a potential exposure ranging from approximately zero to $2 million, and that he has not retained an expert to analyze this potential substantial liability.

The Debtor also relies on the BAA / BA Tech Litigation as a potential source of value (Doc. 213; Ex. D).  But monetizing that litigation is problematic, as stated above.

The Court finds that the Debtor's financial disclosures were inaccurate and were only amended after significant omissions were identified by the Judgment Creditors (Exs. 17, 18; Exs. J, K).  The Debtor's original Statement of Financial Affairs did not disclose certain income, including substantial proceeds from a series of art sales in the amount of $48,478.89 in 2024 and $64,000.00 in 2025 (Ex. 17; Exs. 11–12).  The Debtor later amended his Statement of Financial Affairs to include that information (Ex. 18; Ex. J). The Court discounts the Debtor's claim that the omissions were a mere oversight since the assets were sold over a period of time and involved unique items of personal property, pieces of artwork.

The Debtor also employed special counsel in connection with both the filing of a Rule 60 motion in Florida federal court, Rennet Vogel Mandler & Rodriguez, P.A. and special counsel, JVAM, PLLC, to represent the Debtor in the Pitkin County Litigation.  This Court granted those applications, but the employment orders expressly provided that such attorneys' fees and costs were not to be paid by the bankruptcy estate absent further

17

order (Ex. 21).  As of the date of the evidentiary hearing, no such Rule 60 motion or fee applications have been filed, and the record does not identify who is paying the litigation expenses.

The Court notes that the Debtor's friend, Marc Billings, failed to comply with a subpoena.  The Debtor redacted portions of the BAA / BA Tech Litigation contingency fee agreement and could not explain what was redacted or the reasons for the redactions. He failed to schedule a Venmo account.  He made inaccurate statements in his initial plan on the status and amount of potential recovery in the BAA / BA Tech Litigation.

## ANALYSIS

11 U.S.C. § 1112(b)(1) provides that the Court shall dismiss or convert a Chapter 11 case for "cause," whichever is in the best interests of creditors and the estate.  The statute provides a non-exclusive list of circumstances constituting cause.  11 U.S.C. § 1112(b)(4).  In addition to the enumerated grounds, courts have recognized that lack of good faith constitutes cause for dismissal.  *In re Laguna Assocs. Ltd. P'ship*, 30 F.3d 734 (6th Cir. 1994); *In re Nursery Land Dev., Inc.,* 91 F.3d 1414 (10th Cir. 1996); *In re Roberts*, 644 B.R. 220, 227–29 (Bankr. D. Colo. 2022)(aff'd, *Roberts v. Sender (In re Roberts)*, No. 25-1103, 2026 LX 112240 (10th Cir. Mar. 31, 2026)).

In evaluating bad faith, courts consider the totality of the circumstances.  The analysis is not governed by a rigid formula and must be conducted on a case-by-case basis.  *Winslow v. Williams Grp.*, 949 F.2d 401, 1991 WL 261696, at *2 (10th Cir. Dec. 6, 1991); *Roberts*, 644 B.R. at 227–29.

The Motion seeks dismissal under 11 U.S.C. § 1112(b) based on multiple grounds, including bad faith and the absence of any realistic prospect of reorganization.

Judgment Creditors bear the burden of establishing cause by a preponderance of the evidence.  Once cause is established, the burden shifts to the Debtor to demonstrate unusual circumstances under 11 U.S.C. § 1112(b)(2), establishing that dismissal or conversion is not in the best interests of creditors and the estate.  *Roberts*, 644 B.R. at 231.

Specifically, 11 U.S.C. § 1112(b)(2) provides:

The court may not convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate, and the debtor or any other party in interest establishes that—

18

(A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and

(B) the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A)—

(i) for which there exists a reasonable justification for the act or omission; and

(ii) that will be cured within a reasonable period of time fixed by the court.

The Court first analyzes whether cause for dismissal exists under 11 U.S.C. § 1112(b), and if so, whether the exception under 11 U.S.C. § 1112(b)(2) applies.

## 1.  Cause under 11 U.S.C. § 1112(b)(1)

The Court concludes that cause exists under 11 U.S.C. § 1112(b)(1).  The record establishes that the Debtor lacks a realistic possibility of reorganization and that the case was filed and prosecuted in bad faith.  As explained below, that conclusion is reinforced by the Debtor's inability to effectuate a confirmable plan, by the failure of the 11 U.S.C. § 1112(b)(2) exception, and by the record supporting cause under 11 U.S.C. § 1112(b)(4)(A).

### a.     *Bad Faith*

In the Tenth Circuit, lack of good faith constitutes cause under 11 U.S.C. § 1112(b). *Nursery Land*, 91 F.3d at 1414.  Courts evaluate bad faith under the totality of the circumstances.  *Winslow*, 949 F.2d 401, 1991 WL 261696, at *2; *Roberts*, 644 B.R. at 227–29.

Courts evaluating bad faith often consider a series of non-exclusive factors derived from *Laguna*, including whether:

(1) the debtor has a single asset;

(2) the debtor has few unsecured creditors;

(3) the debtor's property is subject to foreclosure or similar creditor remedies;

(4) the debtor has no ongoing business or employees;

(5) the filing was precipitated by a dispute with a single creditor;

(6) the timing of the filing evidences an intent to delay or frustrate creditor enforcement; and

(7) the debtor lacks a realistic possibility of reorganization.

*Nursery Land*, 91 F.3d at 1415–16 (citing *Laguna*, 30 F.3d at 737–38); *Roberts*, 644 B.R. at 227–29.  These factors are not exhaustive, and no single factor is dispositive.  The Court evaluates them under the totality of the circumstances on a case-by-case basis.

Applying those factors here, the Court finds that the record supports a finding of bad faith.

The first factor is in favor of a bad faith finding.  While this case does not present itself as a classic single-asset real estate case, when the layers are peeled back, that is in fact what this case is about.  The Debtor identifies multiple assets to fund his plan of reorganization, including his disputed interest in the BSL Property, the BAA / BA Tech Litigation, and consulting income from Black Dove.  The relevant inquiry is whether those assets provide a presently realizable basis for reorganization.  The value of these assets is contingent, disputed, and speculative since they rely on successful litigation in the cases of the BSL Property and the BAA / BA Tech Litigation or the future success of Black Dove.  The Debtor's argument he can sell the BSL Property and distribute the net proceeds to creditors is speculative and the subject of continued litigation.  Also, the amount available to pay creditors from the BSL Property decreases daily.  Any recovery in the BAA / BA Tech Litigation is also contingent upon success in the litigation, and the Court was not presented with a cogent explanation of the claims or their collectability.  Finally, the Black Dove future income stream from the consulting contract is questionable.  Since the chief source of funding the plan is to sell the BSL Property, which is a tangible single real estate asset, and the bankruptcy case was filed to allow the debtor to remain in the BSL Property ad infinitum, the Court characterizes this as a single asset case.

The second factor weighs in favor of bad faith.  The case is dominated by the Judgment Creditors, who hold final, non-appealable judgments exceeding $17 million.  The other claims are comparatively small including loans from friends (none of whom initiated litigation pre-petition to collect their debts) and litigation expenses.  The ngena claim is highly suspect.  The Estate of ngena, GmbH filed a proof of claim in the amount of $119,075,620.00 and joined in the Debtor's Objection to the Motion to Dismiss (Doc. 203).  This debt was not listed in any of the Debtor's Schedules.  This claim was not asserted until the Debtor travelled to Germany and met with ngena's insolvency administrator, whose claim is based on a theory that the Debtor is liable for all of the claims asserted in a German insolvency matter, supported by a single letter attached to the proof of claim.  In closing argument, the Debtor stated he was not sure whether he would object to the ngena claim.

20

The Court believes this is a claim from a "friendly" creditor as part of the Debtor's efforts to distinguish this case from a two-party dispute and create an impaired accepting unsecured creditor class. After all, who forgets to schedule a $120 million claim? As a result, the Court totally discounts the claim in the analysis of the second factor. Thus, while the Debtor has gerrymandered claims to support the proposition this is not a two-party dispute, the Court finds that it is in fact a two-party dispute between the Debtor and the Judgment Creditors.

The third factor also weighs in favor of bad faith. The Debtor's interest in the BSL Property was not formally "posted for foreclosure," however, the bankruptcy case was filed shortly before the trial in Pitkin County. The Court believes the Debtor objected to relief from stay to forum shop and remove the litigation to the Bankruptcy Court to delay the trial. Ultimately, after conducting a trial on the merits at which the Debtor and other parties testified and at which the Debtor received a full and fair opportunity to assert his positions, the Special Master ruled against him and determined that ownership of the membership interest in 115 Blue Spruce Lane, LLC, is owned by Dinamo, rejected the Debtor's constructive trust and fraudulent transfer theories, and concluded that the governing agreements created an equitable mortgage the enforcement of which must proceed through judicial foreclosure (Ex. 5 / Ex. G). The Debtor has filed an objection to the Verdict to the District Court. The Court predicts the matter will be tied up in litigation for the foreseeable future while the Debtor lives rent free in the BSL Property.

The fourth factor weighs strongly in favor of bad faith. The Debtor does not operate an ongoing business, has no employees, no operating business activity, and no revenue-generating enterprise capable of rehabilitation. His plan depends primarily on the success of litigation. This matters because Chapter 11 is designed to preserve jobs and allow an ongoing economic enterprise the opportunity to restructure legitimate debts. Where a debtor has no business operations, the case must be justified by some other concrete and reasonably immediate path to reorganization. The Debtor has not established such a path.

The fifth factor weighs in favor of bad faith. The filing was precipitated by the Judgment Creditors' commencement of collection efforts to enforce the judgment against the Debtor. The Court recognizes that the Debtor was also involved in other disputes at the time of filing, including the Pitkin County Litigation and the BAA / BA Tech Litigation. But the Pitkin County Litigation and the BAA / BA Tech Litigation do not alter the conclusion that this bankruptcy case was filed after the Judgment Creditors obtained a substantial judgment and began enforcing it.

The sixth factor also weighs in favor of bad faith. Timing alone does not establish bad faith. A debtor may file Chapter 11 to stay an eviction or foreclosure. But timing is

probative when the petition is filed immediately after a major adverse event, and the record does not show a legitimate restructuring alternative.  Here, the petition was filed after entry of the Judgment Creditors' judgment and during active collection efforts.  The timing supports the conclusion that the filing was intended to halt or delay enforcement of the Judgment Creditors' judgment and the progress of the Pitkin County Litigation.

The seventh factor weighs strongly in favor of bad faith and is central to the Court's analysis.  Although this factor overlaps with feasibility and rehabilitation considerations previously addressed, the Court considers it here as part of the totality-of-the-circumstances inquiry.  The Debtor's proposed path forward depends on three categories of value: (i) consulting income or an equity position from Black Dove, (ii) the sale or refinance of the BSL Property, and (iii) potential recovery from the BAA / BA Tech Litigation.  None of these sources provide a presently reliable or reasonably predictable basis for reorganization.

A final additional factor is the Debtor's abuse of the bankruptcy court as a litigation tactic.  A Chapter 11 debtor-in-possession is a fiduciary whose duties include treating all creditors fairly.  An additional indicium of bad faith is the Debtor using bankruptcy court-approved counsel, Robert Stein, to represent a creditor (ngena), in a newly-filed lawsuit against another creditor, the Judgment Creditors, to gain a litigation advantage.  This is illustrated by the ngena $120 million proof of claim and the eve of trial lawsuit ngena filed against the Judgment Creditors to coerce the Judgment Creditors to drop the motion to dismiss and their claims to the BSL Property.  The Debtor was evasive when questioned by the Judgment Creditors about his knowledge and role in the lawsuit.

The Court therefore finds that cause exists under 11 U.S.C. § 1112(b) based on bad faith and the absence of any realistic prospect of reorganization.

### b.      Inability to Effectuate a Plan

The Court's finding that the Debtor lacks a realistic possibility of reorganization is independently confirmed by the Debtor's inability to propose and effectuate a confirmable Chapter 11 plan.

Although not expressly enumerated in 11 U.S.C. § 1112(b)(4), courts recognize that a debtor's inability to propose or confirm a feasible plan may constitute cause under 11 U.S.C. § 1112(b).  *Roberts*, 644 B.R. at 231.  This inquiry overlaps with rehabilitation but focuses more directly on whether the debtor can satisfy the confirmation requirements of Chapter 11, including feasibility under 11 U.S.C. § 1129(a)(11), within a reasonable period of time.

As set forth in detail above, the Debtor has failed to demonstrate a reasonable likelihood that a plan satisfying the requirements of Chapter 11 can be confirmed within a reasonable time.

The Court further finds that the Debtor's proposed plan raises substantial feasibility concerns under 11 U.S.C. § 1129(a)(11). The plan's dependence on speculative litigation outcomes and contingent assets does not establish a reasonable likelihood that the Debtor can perform under the plan.

Accordingly, the Court finds that the Debtor lacks the ability to effectuate a confirmable plan within a reasonable time. This conclusion reinforces the Court's finding that the Debtor lacks a realistic possibility of reorganization and supports a determination of cause under 11 U.S.C. § 1112(b). This finding also bears directly on the Debtor's burden under 11 U.S.C. § 1112(b)(2), which requires a reasonable likelihood of confirmation within a reasonable time.

### c. Continuing Loss and Absence of Rehabilitation

The Court's findings also establish cause under 11 U.S.C. § 1112(b)(4)(A), which provides that cause includes "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." These elements are conjunctive and must both be satisfied. *Roberts*, 644 B.R. at 229.

This statutory ground is consistent with, and confirms, the Court's broader determination that the Debtor lacks a realistic prospect of reorganization.

The evidentiary record establishes continuing loss or diminution of the estate. The monthly operating reports show gross income of $52,884 and expenses in the amount of $60,149 for a net loss of $7,265 during the nine months the Debtor has been in this bankruptcy case. The average monthly deficit of -$807 falls far short of the Debtor's positive cash flow projections.

Plus, that amount does not include the approximate $288,000 in administrative debt he has incurred as a result of living in the BSL Property for nine months in the post-petition period without paying the mortgage principal, interest, taxes, insurance or maintenance for the BSL Property. Other administrative expenses include the attorney's fees and expenses of bankruptcy counsel for the Debtor (the Amended Disclosure Statement estimates $40,000 in fees but the Court believes the fees will be substantially more), one-half of the fees of the Special Master estimated to be between $30,000 and $50,000, which the Debtor disputes, and whatever might ultimately be owed to the two special counsels employed by the bankruptcy estate in this case.

23

The relevant inquiry is whether the estate is experiencing ongoing financial decline. *Roberts*, 644 B.R. at 229.  In addition to the above, neither bankruptcy counsel nor the two special counsels for the Debtor have filed fee applications for the significant legal services they have provided in the bankruptcy case and Pitkin County Litigation since the filing of the bankruptcy case.

Accordingly, the Court finds that the Debtor has experienced continuing loss or diminution of the estate.

The evidentiary record also establishes the absence of a reasonable likelihood of rehabilitation.

Rehabilitation, in this context, means restoration to a viable financial condition within a reasonable period of time.  It does not mean the mere possibility that contingent litigation or disputed assets may someday produce value.  *Roberts*, 644 B.R. at 230.

Taken together, the Debtor's financial condition depends on contingent, speculative, and presently unrealizable sources of value, which does not satisfy the requirement of a reasonable likelihood of rehabilitation within the meaning of 11 U.S.C. § 1112(b)(4)(A).

Accordingly, the Court finds that both elements of 11 U.S.C. § 1112(b)(4)(A) are satisfied.  This conclusion reinforces the Court's determination that cause exists under 11 U.S.C. § 1112(b).

## 2.  Exception Under 11 U.S.C. § 1112(b)(2)

The exception provided under 11 U.S.C. § 1112(b)(2) does not apply.

Once cause is established, the Court must dismiss or convert the case unless the debtor demonstrates that the exception set forth in 11 U.S.C. § 1112(b)(2) applies.  Under that provision, the Debtor bears the burden of establishing: (1) unusual circumstances showing that dismissal or conversion is not in the best interests of creditors and the estate; (2) a reasonable likelihood that a plan will be confirmed within a reasonable time; and (3) that there is a reasonable justification for any acts or omissions that constitute cause and that such acts or omissions can be cured within a reasonable time.  *See* 11 U.S.C. § 1112(b)(2); *Roberts*, 644 B.R. at 231.

As the Motion to Dismiss emphasizes, the Debtor's ability to demonstrate a confirmable plan within a reasonable time is central to the 11 U.S.C. § 1112(b)(2) inquiry. The Court addresses each element in that context.

### a.    *Unusual Circumstances*

24

The Debtor has not established "unusual circumstances" within the meaning of 11 U.S.C. § 1112(b)(2).

The Debtor did not argue that special circumstances exist in this case.  He relies on compliance with reporting requirements, attendance at the initial debtor interview and meeting of creditors, production of requested documents to the Judgment Creditors, cooperation in submitting to Rule 2004 exams, maintenance of insurance, and the timely filing of a plan and disclosure statement.  These facts demonstrate the minimum level of participation required in the Chapter 11 process.  He argues that he has no other option but to pursue confirmation of a Chapter 11 plan.  However, he has other options.  One option is to redeem the BSL Property at the impending judicial foreclosure sale.  Another is to promptly move out of the BSL Property so it can be rented and/or listed for sale.

### b.     Reasonable Likelihood of Confirmation Within a Reasonable Time

The Debtor has not demonstrated a reasonable likelihood that a plan will be confirmed within a reasonable time.

As recognized by the Tenth Circuit, a plan premised on speculative litigation outcomes does not satisfy the requirements for confirmation.  *Ames*, 973 F.2d at 851.  On this record, feasibility of the Debtor's plan depends on litigating far into the future with no guarantee of success.

These facts establish that the Debtor cannot demonstrate confirmation can be obtained within a reasonable period of time.

### c.     Reasonable Justification and Ability to Cure the Grounds for Dismissal

The Debtor has not demonstrated that the acts or omissions constituting cause can be justified and cured within a reasonable time.

Taken together, the Debtor has not established unusual circumstances, has not demonstrated a reasonable likelihood of confirming a plan within a reasonable time, and has not shown that the grounds for dismissal can be justified and cured.

Accordingly, the Court finds that the exception set forth in 11 U.S.C. § 1112(b)(2) does not apply.

### 3.  Dismissal or Conversion

Having found that cause exists under 11 U.S.C. § 1112(b), the Court must determine whether dismissal or conversion is in the best interests of creditors and the estate.  11 U.S.C. § 1112(b)(1).

The Court considers the nature of the Debtor's assets, the structure of the creditor body, and whether the appointment of a Chapter 7 trustee would result in a meaningful distribution to creditors.

The Court concludes that dismissal, rather than conversion, is in the best interests of creditors and the estate.  Indeed, the Debtor admits that there would be no distribution to creditors in a Chapter 7 case in his Amended Disclosure Statement (Doc. 237) and closing argument.  That should end the inquiry.

First, the Debtor does not have readily identifiable, non-contingent assets that could be administered by a Chapter 7 trustee for the benefit of creditors.  The Chapter 7 trustee would have no cash to fund continued pursuit of litigation.  As set forth in the Court's findings and analysis above, the Debtor's assets consist primarily of disputed and contingent litigation claims.

Second, the structure of the creditor body weighs in favor of dismissal.  The evidentiary record establishes that the Judgment Creditors hold a dominant claim exceeding $17 million, while the remaining claims, with the exception of the questionable claim asserted by the Estate of ngena, GmbH, are comparatively small and related to personal loans or litigation expenses (Doc. 213).  In this context, conversion would not materially alter the economic reality that this case is a two-party dispute.

Third, the Court finds a Chapter 7 trustee could not materially improve the position of creditors through independent investigation or administration.  A trustee would be required to step into ongoing litigation in multiple forums, incur administrative expenses, and pursue claims that are contingent, delayed, and uncertain in outcome in an estate with no cash.  The record does not establish that such efforts would be likely to result in a net benefit to creditors.

Fourth, dismissal will permit the parties to proceed in the non-bankruptcy forums where the relevant disputes are already being litigated.  The Pitkin County Litigation is pending in Colorado state court, and the BAA / BA Tech Litigation is pending in Florida state court.  Dismissal allows those proceedings to continue.  Plus, the Judgment Creditors have been successful in the Pitkin County Litigation in their claims they are entitled to the equity in the BSL Property and have a judicial lien, through Maite, on any proceeds of the BAA / BA Tech Litigation.  So, the only asset remaining for other creditors is the Debtor's speculative income from Black Dove.

Accordingly, the Court finds that dismissal, rather than conversion, is in the best interests of creditors and the estate.

### 4. Refiling Bar

The Judgment Creditors request that the Court impose a one-year bar on refiling. In the Tenth Circuit, the Court may not impose a bar longer than 180 days. *Frieouf v. United States (In re Frieouf)*, 938 F.2d 1099, 1103–04 (10th Cir. 1991).

Pursuant to 11 U.S.C. §§ 105(a) and 349(a), the Court may impose a refiling bar for cause, including bad faith. The Court has determined that this case must be dismissed under 11 U.S.C. § 1112(b). The question here is whether the record justifies the additional and more serious remedy of restricting the Debtor's future access to the Bankruptcy Court.

The Court concludes that it does not.

A refiling bar is a serious penalty. It is justified where the record shows a concrete risk of repetitive abuse, serial invocation of the automatic stay, or other circumstances demonstrating that dismissal alone will not adequately protect creditors or the integrity of the bankruptcy process. It should not be imposed routinely whenever a case is dismissed for cause, even where bad faith is present.

The Court has carefully weighed the competing considerations.

On the one hand, the Judgment Creditors have legitimate concerns. This case was filed during active collection efforts and has delayed enforcement of a substantial judgment. The Court has found that the Debtor lacks any realistic prospect of reorganization and that his asserted sources of value are contingent and uncertain. The Court also considers the prior Chapter 11 filing by Maite, LLC, which was dismissed as a bad-faith case (Case No. 25-15985-JGR, Docs. 24; 25).

The principal concern is that a second filing could interfere with the completion of the judicial foreclosure of the BSL Property. This concern is mitigated by the fact that judicial foreclosure is required and is unlikely to be completed within a 180-day period.

On the other hand, the Court must determine whether those concerns are sufficiently concrete and immediate to justify restricting future access to bankruptcy relief. The Court concludes that they are not. This is not a case involving multiple successive filings by the Debtor timed to invoke the stay or violations of prior bar orders. Nor does the record establish that the Debtor is poised to file another case immediately upon dismissal.

The Court also considers that the Debtor's financial circumstances remain tied to ongoing litigation and disputed property rights.  The Court has found that those matters do not provide a presently viable basis for reorganization.  But the Court cannot conclude that no material change could occur.  A refiling bar would restrict access to bankruptcy relief even if circumstances were to change in a meaningful way during the bar period.

The Court does not minimize the risk of future abuse.  It acknowledges that risk. But dismissal itself addresses the present misuse of Chapter 11 by terminating the automatic stay and returning the parties to the forums where their disputes are already being litigated.  Any future filing would be subject to immediate scrutiny in light of the record developed here.

Balancing these considerations, the Court concludes that dismissal is warranted, but the additional remedy of a refiling bar is not.

Accordingly, although cause exists to dismiss this case, the Court declines to impose a refiling bar.

## CONCLUSION

For the reasons set forth above, the Court concludes that cause exists under 11 U.S.C. § 1112(b) to dismiss this case, including the Debtor's bad faith and the absence of a reasonable likelihood of rehabilitation.  The bad faith is shown by forum shopping, delay from the bankruptcy filing, speculative sources of plan funding, a minimal distribution of 3% to unsecured creditors and the Debtors' "gaming the system" through the ngena claim and eve of hearing litigation.  The Court does not believe the Debtor can fulfill his promises in his reorganization plan.  The bankruptcy filing is merely another step in the Debtor's litigation strategy to avoid paying the Judgment Creditors.  The Court further concludes that the exception set forth in 11 U.S.C. § 1112(b)(2) does not apply and that dismissal, rather than conversion, is in the best interests of creditors and the estate.

Accordingly, it is

**ORDERED** that the Motion to Dismiss Case for Other Reasons For Cause Pursuant to 11 U.S.C. § 1112(b)(1) filed by 530 Mashta, LLC and Tri-Cap Holdings, LLC on December 5, 2025 (Doc. 188) is **GRANTED**; and it is further

**ORDERED** that this Chapter 11 case is **DISMISSED** pursuant to 11 U.S.C. § 1112(b); and it is further

**ORDERED** that the Court declines to impose any bar on refiling under 11 U.S.C. §§ 105(a) and 349(a); and it is further

28

**ORDERED** that the Clerk of the Court shall close this case after the expiration of applicable appeal deadlines.

Dated this 18th day of May, 2026.

BY THE COURT:

_____

Hon. Joseph G. Rosania, Jr.
United States Bankruptcy Judge

29